GIW INDUSTRIES, INC.,        *
                             *
     Plaintiff,              *
                             *
     vs.                     *        CV 106-127
                             *
JERPEG CONTRACTING, INC.,    *
JERRY SOULTZ, MARGARET SOULTZ, *
and ALVIN QUACKENBUSH,       *
                             *
     Defendants.             *
                             *

---

**O R D E R**

---

This matter comes before the Court on Defendants' motions for summary judgment. (Doc. nos. 41, 57.)  Upon the following, Defendants' motions are **GRANTED IN PART** and **DENIED IN PART**.

## I. STATEMENT OF THE CASE

GIW Industries, Inc. ("GIW") brought this dispute against its former employee, Alvin Charles Quackenbush, its former contractor, JerPeg, Inc. ("JerPeg"), and JerPeg's owners, Jerry and Margaret ("Peg") Soultz. In its complaint, GIW alleges that JerPeg breached nineteen purchase order ("PO") contracts by failing to perform, either partially or entirely, under the terms of the contracts. (Compl. ¶ 23.) Next, GIW alleges that JerPeg and the Soultzes committed fraud by submitting invoices and otherwise making representations that the work was completed satisfactorily under the aforementioned PO contracts. (Id. ¶¶ 27-29.)

1

As to Defendant Quackenbush, GIW alleges two claims. First, GIW alleges Quackenbush defrauded GIW by approving the JerPeg invoices for payment on projects he knew or should have known were incomplete or not done. (<u>Id.</u> ¶¶ 30-31.) In addition, GIW alleges that, by approving these invoices, Quackenbush breached his duty of loyalty and good faith. (<u>Id.</u> ¶ 36.) As required at this stage in the proceedings, the following facts are viewed in a light most favorable to GIW, the nonmovant.

## II. <u>FACTUAL BACKGROUND</u>

On April 15, 2003, GIW, a slurry pump manufacturer, hired Quackenbush as Plant Engineer for its Grovetown and Thomson Georgia plants. In this capacity, Quackenbush was charged with overseeing various capital projects involving plant maintenance. Quackenbush was also authorized to prepare bid documentation and contracts to carry out this work. (<u>See</u> Harris Dep. at 10-11, Ex. 1.) For a service contract, because the work performed does not normally go through receiving, Quackenbush was required to sign the invoices to attest that the work was completed in a workmanlike manner. (Harris Decl. ¶¶ 5, 14.) Quackenbush's signature directed GIW's accounting employees to pay the invoice. (Harris Dep. at 121.)

JerPeg is an Indiana corporation owned by Jerry and Peg Soultz. Mr. and Ms. Soultz are the only officers of JerPeg, and they are JerPeg's sole shareholders. (Soultz Dep. at 18-19.[1]) Quackenbush first worked with JerPeg on a project around 1986.

---

[1] All Soultz deposition citations refer to the deposition of Jerry Soultz unless otherwise indicated.

Since that time, Quackenbush and the Soultzes maintained an ongoing social relationship. The Soultzes attended a Quackenbush wedding and graduation. (<u>Id.</u> at 40.) After taking the job as Plant Engineer with GIW, Quackenbush contacted Mr. Soultz about some of the projects he was in charge of for GIW. (<u>Id.</u> at 32.) As a result, from July 2003 until November 2005 JerPeg worked on multiple projects at GIW, including the nineteen POs which are at issue in this case. (<u>See</u> Compl. ¶¶ 10-16.)

GIW's PO contracts contain language explicitly stating: "MODIFICATION OF AGREEMENT. This purchase agreement may not be modified except by a writing signed by both Buyer and Seller."[2] (Harris Decl. ¶ 11, Ex. A.) Thus, pursuant to the plain terms of the POs, any modifications to the PO contracts were required to be in writing. Nevertheless, during the course of JerPeg's performance, there were times when Quackenbush would change the scope of the work after the purchase order had been issued and "trade out" work of equivalent value. (Soultz Dep. at 81; Quackenbush Dep. at 121-22.) Quackenbush believes that all swapped work "balanced out." (Quackenbush Dep. at 270-71.)

For example, PO G-45886 called for JerPeg to "remove gantry across driveway and install air compressor dense phase sand system." (Defs.' Ex. 1.) Mr. Soultz acknowledged that JerPeg did not do the work on this PO "in whole or in part." (Soultz Dep. at 76-77.) Instead, JerPeg invoiced for work to

---

[2] All Defendants have acknowledged that the PO contracts on which GIW has brought suit are valid contracts. Of note, these contracts contain, *inter alia*, a warranty "that all goods and services covered by this [PO] shall conform to the specifications, drawings, samples or other description upon which this order is based." (Harris Decl. Ex. A.)

"fabricate and install additional transporter; tie B tank together & all remedial work necessary as per [e]ngineering." (Defs.' Ex. 2.) The amount JerPeg invoiced under this PO matches precisely the amount set forth in the PO, even though JerPeg performed completely different work. (Soultz Dep. at 80-81.) Quackenbush testified that he did not issue change orders for this work because he claims no one at GIW ever "told me to do a change order or how to do a change order." (Id. at 144-45.) Charles Harris, Quackenbush's supervisor, filed an affidavit which contradicted Quackenbush's testimony. Specifically, Harris stated:

> I informed Quackenbush that if the scope of the work changed he had to get a revised quote from the vendor. I also informed Quackenbush that if a change was outside the original amount of the [p]urchase [o]rder, a change order should be issued.

(Harris Decl. ¶ 12.)

Another disputed issue with respect to the PO contracts involves invoicing. According to JerPeg, Quackenbush suggested it use the language on the invoices that followed the language of the PO, even when the actual work performed varied from the PO description. (Quackenbush Dep. at 121-22 ("[W]e traded off some work, and I told them to just follow the wording on the purchase order.")) Contrarily, GIW points to the fact that Quackenbush also testified that "I never told [JerPeg] how to actually word an invoice. It was normally just copied off the purchase order." (See id. at 121.) In fact, when asked why he would tell contractors to follow the language of the PO, Quackenbush clarified, "I [] would tell them, hey, write down what we did, write it down." (Id.) Regardless, JerPeg's invoice description usually mirrored that of the PO, even if the work

performed was different than the PO description.[3] In many instances, JerPeg also noted on its invoices that the work had been done "AS PER AL QUACKENBUSH" (or some similar language) to indicate that Quackenbush had directed what was to be done. (See generally Defs.' Ex. App.)

For example, PO G-52473 called for JerPeg to "fabricate four load stands certified for 35,000 lbs each to be used for Toshiba table[.] [T]able weight 105,000," which is exactly what JerPeg invoiced. (See Defs.' Exs. 20, 21.) However, the stands JerPeg provided were never certified to hold the requisite weight. In fact, Mr. Soultz acknowledged in deposition that anyone at GIW relying solely on the PO or invoice would have no way of knowing that the stands were not certified. (Soultz Dep. at 118-19.)

One of GIW's biggest projects with JerPeg, encompassing seven of the nineteen POs at issue in this case, concerned the foundation required for installation of a specific machine. (See Defs.' Exs. 23-35.) Mr. Soultz acknowledged that JerPeg (1) invoiced GIW for "preparatory work on drawings and PE stamp for Toshiba machine foundation as per our proposal"; (2) charged $67,750 for that work; (3) received payment; and (4) never provided a PE stamp to GIW. (Soultz Dep. at 130, Defs.' Ex. 26.) Although Mr. Soultz claims that "he did as [Quackenbush] told [him] to do, when specifically asked about this invoice in deposition, Mr. Soultz acknowledged that it was a "lie" that he provided $67,750 in drawing work or PE stamps,

---

[3]JerPeg claims that it is common in the construction industry for the work actually performed and invoiced under the original PO to be different than the original PO. (See, e.g., JerPeg Mem. at 28.) According to GIW, this is neither common in the construction industry nor an accepted practice at GIW. (See Harris Decl. ¶ 33.)

5

as indicated on invoice 05-JP-124 for Purchase Order G-54592. (Soultz Dep. at 133-34.)

On multiple occasions, Harris voiced his concerns to Quackenbush that several projects under contract to JerPeg appeared incomplete.[4] (Harris Dep. at 12-13.) In response, Quackenbush always reassured Harris that the projects would be completed in due course. (Id. at 16.) Quackenbush responded similarly to other GIW employees when they brought concerns to his attention. (Sterzen Dep. at 18; Neal Dep. at 35, 41-42.)

## A. **Brief Summary of the Disputed Contracts**

GIW Purchase Order G-45886: On or about September 16, 2003, GIW and JerPeg entered into this contract for JerPeg to remove a gantry across a driveway and install an air compressor dense phase sand system. When asked about this work, Mr. Soultz admitted "[w]e did not do [the work for Purchase Order 0-45886] in whole or in part." (Soultz Dep. at 77, 78, 81; see also Harris Dep. at 41, 45-46.)

GIW Purchase Order T-14438: On or about March 28, 2005, GIW and JerPeg entered into this contract for JerPeg to install a ten ton Shawbox crane, underhung bridge, electric rails, and supports. In deposition, Mr. Soultz admitted that JerPeg left the job incomplete. (Soultz Dep. at 101; see also Baggett Dep. at 39-40.)

GIW Purchase Order T-14484: On or about May 12, 2005, GIW and JerPeg entered into this contract for JerPeg to install ten columns with footers and main beams for this ten ton Shawbox crane. According to GIW, JerPeg never completed installation and the work that JerPeg did has been condemned as unsafe. (See generally Harris Decl. ¶ 19; Compl. ¶ 11.)

GIW Purchase Order T-14514: On or about June 17, 2005, GIW and JerPeg entered into this contract for JerPeg to cut and install end trucks, shorten the crane span, and install this ten ton Shawbox crane. According to GIW personnel, JerPeg's modifications caused the crane to interfere with the building, the crane modifications were not square, the crane wheels did

---

[4]Of note, any complaint Harris had about JerPeg's performance was channeled through Quackenbush. (Harris Dep. at 13.) Harris never discussed work directly with representatives of JerPeg. (Id. at 13, 15.)

not stay in contact with the rails, and the modifications were not certified or to specification. (Baggett Dep. at 39-40; Baggett Decl. Ex. 1 at ¶ 5(a); Sterzen Dep. at 31-32.)

GIW Purchase Order G-52321: On or about February 18, 2005, GIW and JerPeg entered into this contract for JerPeg to remove the Toshiba crane support and install a new 40-foot cross support beam, in addition to completing a core bore, checking the footers, and installing additional column supports if necessary. According to GIW, JerPeg did not complete this work to specification. (Compl. ¶ 12; Sterzen Dep. at 36.) At deposition, Mr. Soultz was shown a picture of the crane support which apparently depicted cracked and broken welds. (Soultz Dep. Ex. 38.) Mr. Soultz agreed that if the welds were broken, that would not be "workmanlike installation," however Mr. Soultz maintained that Jerpeg did the welding per Quackenbush's direction. (See Soultz Dep. at 112-13; Pl.'s Ex. 38.)

GIW Purchase Order G-52473: On or about February 28, 2005, GIW and JerPeg entered into this contract for JerPeg to fabricate four load stands certified for 35,000 pounds each to be used with the Toshiba crane. According to GIW, JerPeg never supplied any certification for the fabricated stands. (Sterzen Dep. at 42; see also Soultz Dep. at 117, 123; Quackenbush Dep. at 170.)

GIW Purchase Order G-54592: On or about July 17, 2005, GIW and JerPeg entered into this contract for JerPeg to provide supervision, labor, and equipment to excavate a foundation for the Toshiba crane. According to GIW, JerPeg dug the foundation too deep, installed an ineffective water pump system, and improperly constructed the concrete walls and maintenance tunnel. JerPeg also did not provide engineering approval or drawings with a PE stamp. (See Harris Dep. at 35, 38-39, 62; Sterzen Dep. at 33-34; Soultz Dep. at 133-34.)

GIW Purchase Order G-55628: On or about September 13, 2005, GIW and JerPeg entered into this contract for JerPeg to excavate an area, install a 20-inch beam, and install additional footers for the Toshiba crane. According to GIW, JerPeg dug the excavation area too deep and the beam installed by JerPeg was inadequate for the contract purpose. (See Doc. no. 104 at 38-39.)

GIW Purchase Order G-55806: On or about September 26, 2005, GIW and JerPeg entered into this contract for JerPeg to excavate and cut out pilings for columns, and install a 12-inch compacted crusher run. According to GIW, JerPeg improperly placed the pilings. (Id. at 39.)

GIW Purchase Order G-56042: On or about October 10, 2005, GIW

and JerPeg entered into this contract for JerPeg to do additional work on the Toshiba crane foundation to reinforce the main crane runway columns. According to GIW personnel, JerPeg used inadequate frames to support the beams, which required GIW to remove and replace the frames. (See Baggett Decl. Ex. 1 at ¶ 5(b); Baggett Dep. at 47, 53.)

GIW Purchase Order G-56355: On or about October 28, 2005, GIW and JerPeg entered into this contract for JerPeg to, among other things, remove and reinstall a roof. According to GIW, JerPeg did not replace the roof properly. (Sterzen Dep. at 42-43.)

GIW Purchase Order G-52136: On or about February 8, 2005, GIW and JerPeg entered into this contract for JerPeg to remove end trucks, wheels, bearings, shafts, and drive gears from the crane and replace and reinstall these components as needed. According to GIW, JerPeg performed little, if any, work under this contract. (See Doc. no. 104 at 40.)

GIW Purchase Order G-52324: On or about February 18, 2005, GIW and JerPeg entered into this contract for JerPeg to install eight new support beams for main rail columns, install new footers, and complete electrical work for this project. According to GIW, no supporters are in place. (Sterzen Dep. at 44.)

GIW Purchase Order G-52477: On or about February 28, 2005, GIW and JerPeg entered into this contract for JerPeg to remove the crane's hoist, drum, motor, wheels, and brakes and repair/replace these components as needed. According to GIW, JerPeg did not perform this contract in a workmanlike manner. (See Doc. no. 104 at 40-41.)

GIW Purchase Order G-52572: On or about March 7, 2005, GIW and JerPeg entered into this contract for JerPeg to add additional cross supports in ten places on the main rails for the crane. According to GIW personnel, JerPeg never performed any work under this contract. (Baggett Decl. Ex. 1 at ¶ 5(c); Sterzen Dep. at 44.)

GIW Purchase Order G-56254: On or about October 24, 2005, GIW and JerPeg entered into this contract for JerPeg to check the crane's structure, rebuild end trucks, paint the crane, and provide maintenance to replace all the crane's wiring. According to GIW personnel, JerPeg never performed any work under this contract. (Sterzen Dep. at 43-44; Baggett Decl. Ex. 1 at ¶ 5(d).) This purchase order was also unnecessarily duplicative of GIW Purchase Order G-52136, as both purchase orders contracted for the same work. (Sterzen Dep. at 44.)

<u>GIW Purchase Order G-53089</u>: On or about April 15, 2005, GIW and JerPeg entered into this contract for JerPeg to supply labor and duct-work and fans for cooling furnace control rooms. According to GIW, JerPeg purchased a $500 fan, but never performed any work under this contract. (Sterzen Dep. at 46; <u>see also</u> Harris Dep. at 71-72; Soultz Dep. at 171-74.)

<u>GIW Purchase Order T-14566</u>: On or about August 8, 2005, GIW and JerPeg entered into this contract for JerPeg to supply labor to install an electrical cable tray and panel boards for an industrial grinding area. According to GIW, JerPeg did not complete the electrical tray work. (<u>see</u> Sterzen Dep. at 47.)

<u>GIW Purchase Order G-48252</u>: On or about March 17, 2004, GIW and JerPeg entered into this contract for JerPeg to install a fan in a compressor room and check the manipulator. According to GIW, JerPeg did not complete the work under this contract. (<u>See id.</u>)

## B. **Jerpeg and Quackenbush's Departure from GIW**

Around Thanksgiving 2005, JerPeg demobilized from the GIW plant and returned to Indiana. (Quackenbush Dep. at 273.) The parties dispute the factual circumstances surrounding JerPeg's departure. According to JerPeg, Quackenbush was aware of its intention to return to Indiana. As evidence of this, JerPeg points out that Quackenbush had signed off on all invoices at issue. Thus, according to JerPeg, the jobs were completed and accepted by GIW through Quackenbush. (<u>See</u> Def.'s Ex. App.)

On the other hand, GIW contends that JerPeg's demobilization was nothing short of a midnight exodus. In fact, GIW alleges JerPeg exited with several open projects. (Harris Decl. ¶ 27.) GIW also contends that although Quackenbush may have known JerPeg was leaving, he was unaware that JerPeg would not return. In fact, GIW points to an email from Quackenbush to Mr. Soultz, sent less than one week after JerPeg's departure. In the email, Quackenbush stated "Please call[,] columns are out 5/8 to 3/4 but I think we can correct by jacking everything

over if not one column will have to come out. . . . Many people asking what is going on with JerPeg. Wish you were here to look at this problem." (Quackenbush Dep., Ex. 106.)

On December 23, 2005, Quackenbush resigned from GIW to take a job in Minnesota. (Quackenbush Dep. at 158.) Quackenbush informed GIW of his departure by letter. (See Harris Decl. Ex. B.) In this letter, Quackenbush indicated he would work through January 6, 2006. However, Quackenbush did no work in January 2006. According to Harris, Quackenbush simply left one day without telling anyone at GIW that he would not return. (Harris Decl. ¶ 29.) In fact, Quackenbush emailed Harris on January 10, 2006, apologizing for not having "made it back yet to close out" and indicating that he expected to return the following week. (Harris Decl. Ex. C.) Harris responded by email the same day, deploring Quackenbush's lack of notice in leaving and emphasizing the "difficult situation" in "trying to understand [the status of] all the unfinished projects" given the absence of any paper or electronic documentation concerning JerPeg's work. (Harris Dep. at 54-56.)

Around this time, Harris and his colleagues at GIW began a closer examination of JerPeg's work, including projects it had open and deficiencies in the completed work. (Harris Decl. ¶ 29.) GIW repeatedly attempted to express its concerns to Mr. and Ms. Soultz by email, letter, and telephone. (Id. ¶ 28.) In fact, GIW employee Pat Farr testified regarding two telephone conversations he had with Ms. Soultz. (Farr Dep. at 15-16.) Ms. Soultz stated that the projects had been completed and there was nothing more she could do. (Id.; Peg Soultz Dep. at 17-24.) Similarly, on February 7, 2006, Mr. Soultz emailed Scott

Nutial, the purchasing manager for GIW, and stated that all JerPeg projects had been "completed satisfactorily" and that he would "be glad to help" with any questions concerning JerPeg's work. Thereafter, Mr. Nutial replied to this email, requesting JerPeg's return. (See Nutial Decl. Ex. A.) Ultimately, despite GIW's efforts, JerPeg never returned to GIW, nor did it provide any information GIW requested. (Harris Decl. ¶ 28.)

After Quackenbush resigned, GIW employees could not locate any hard copies of documents or email correspondence concerning the work JerPeg contracted to perform. (Harris Dep. at 55-56, 107, 112-13; Harris Decl. ¶ 30.) In fact, according to GIW, file cabinets where hard copies of pertinent documentation concerning JerPeg's projects had been stored were found empty. Moreover, GIW's IT Department was unsuccessful in uncovering any electronic documentation pertaining to JerPeg. (Harris Dep. at 112-13; Harris Decl. ¶ 30.) GIW employees found this lack of documentation perplexing because in the past Harris reviewed "hard copies of paperwork" and Quackenbush often communicated with Harris about JerPeg projects via GIW's internal email. (Harris Dep. at 55-56, 107, 112-13.)

Similarly, after Quackenbush resigned, GIW discovered that Mr. Soultz had occasionally emailed its invoices to Quackenbush's personal email account.[5] (Quackenbush Dep. at 109-11; Soultz Dep. at 54.) According to GIW, this stands in contrast to GIW protocol. (Farr Dep. at 9.) As a matter of routine, invoices are mailed to GIW at its principal address, which is located on the face of the purchase order. (Id.) At

---

[5]According to Quackenbush, the hard drive to his personal computer "died" shortly after he resigned from GIW. (Quackenbush Dep. at 110.)

deposition, Quackenbush explained that he desired to have the JerPeg invoices printed out and "over to accounting" as soon as possible so that GIW could take advantage of a two percent (2%) discount JerPeg offered.[6] (Quackenbush Dep. at 111.) According to GIW, however, printing the invoices at work is just as convenient if the aim is to deliver the printed invoices to GIW's accounting department. Quackenbush also testified that he traveled frequently and it was convenient for the invoices to be emailed to his personal account. However, GIW points out that Quackenbush testified that he was able to access his work email remotely and from his home computer. (See id. at 109-11.)

GIW employed a Certified Public Accountant to review Quackenbush's bank records during the relevant time period. An analysis of Quackenbush's bank records shows that, beginning in September 2003, significant cash deposits were made to his personal account. (Douglas Decl. Ex. 5.) These cash deposits, which continued through 2005 and stopped shortly thereafter, exceeded the salary GIW paid to Quackenbush, which Quackenbush characterized in deposition as his sole source of income during the time he resided in Georgia.[7] (Quackenbush Dep. at 32.) Quackenbush explained that he routinely cashed his GIW salary check and would keep the cash in a metal box in his bedroom closet and would, as payment of bills required, deposit cash into his account. (Id. at 28-32.) An analysis of Quackenbush's records and an allowance for the bills which he testified and

_____

[6]In this context, GIW also points out that although there was no provision in any contract for payment in advance of work performed or materials provided, Mr. Soultz admitted in deposition that, through Quackenbush, JerPeg was paid in advance of its work on some projects. (Soultz Dep. at 148-49.)

[7]After the first break in his deposition, Quackenbush clarified that in addition to his income from GIW, he also sold several items. (Quackenbush Dep. at 79-106.) Of note, Quackenbush did not report these items as income on his Federal income tax return. (Id.)

acknowledged he paid show that Quackenbush's purported explanation does not explain the source of the cash deposits. (Douglas Decl. ¶ 21.)

Likewise, analysis of JerPeg's company account shows "[f]rom January 2005 through December 2005, JerPeg wrote checks from its company checking account number [XXXXXX]1127 to Jerry Soultz and/or Margaret [Peg] Soultz totaling $649,865.00. Of this amount, $551,265.00 was deposited into the Soultzes' personal checking account number [XXXXXX]7868. The remainder, $98,600.00, was either cashed or deposited into accounts unknown." (Id. ¶ 26.) In addition, a review of the bank records for Jerry Soultz and Peg Soultz shows that, in 2005, they deposited checks from their personal account into the JerPeg company account number [XXXXXXX]0813 in the amount of $237,467.10. (Id. ¶¶ 27, 28.)

## III. **STANDARD OF REVIEW**

A party is entitled to summary judgment when the party can show that there is no genuine issue as to any material fact. Fed. R. Civ. P. 56(c); Beal v. Paramount Pictures Corp., 20 F.3d 454, 458 (11th Cir. 1994). Which facts are material depends on the substantive law applicable to the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The moving party bears the burden of showing that no genuine issue of material fact exists. Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991).

The Court must consider all inferences drawn from the underlying facts in a light most favorable to the non-moving party, and resolve all reasonable doubts against the moving party. Anderson, 477 U.S. at 255. The Court is not, however, required to accept all of the nonmovant's factual

13

characterizations and legal arguments. <u>Beal</u>, 20 F.3d at 458-59.
If material issues of fact exist, the Court must not decide
them, but rather, must deny the motion and proceed to trial.
<u>Environmental Def. Fund v. Marsh</u>, 651 F.2d 983, 991 (5th Cir.
1981).

## IV. <u>DISCUSSION</u>

### A. <u>Breach of Fiduciary Duty Claim</u>

GIW has brought a breach of fiduciary duty claim against
Quackenbush, claiming he shared a "fiduciary relationship of
mutual confidence demanding the utmost good faith." GIW further
claims Quackenbush violated this duty by "approving JerPeg
invoices for payment for work that he knew, or should have
known, was incomplete or not done." (Compl. ¶¶ 35-36.)
Quackenbush moves for summary judgment on this claim,
contending that the relationship he and GIW shared was that of
employee-employer and did not rise to the level of a fiduciary
or "confidential" relationship.

Under Georgia law, "[t]he employee-employer relationship
is not one from which the law will necessarily imply fiduciary
obligations; however, the facts of a particular case may
establish the existence of a confidential relationship between
an employer and an employee . . . thereby placing upon the
parties the fiduciary obligations associated with a principal-
agent relationship." <u>Atlanta Mkt. Ctr. Mgmt., Co. v. McLane</u>,
269 Ga. 604, 607, 503 S.E.2d 278, 281-82 (1998) (citing <u>Cochran
v. Murrah</u>, 235 Ga. 304, 307, 219 S.E.2d 421, 424 (1975) and
<u>Remediation Servs., Inc. v. Georgia-Pacific Corp.</u>, 209 Ga. App.
427, 431-32, 433 S.E.2d 631, 635-36 (1993)). Under O.C.G.A. §
23-2-58,

> [a]ny relationship shall be deemed confidential whether arising from nature, created by law, or resulting from contracts, where one party is so situated as to exercise a controlling influence over the will, conduct, and interest of another or where, from a similar relationship of mutual confidence, the law requires the utmost good faith, such as the relationship between partners, principal and agent, etc.

For a relationship to be deemed confidential, all the law requires is a showing of a relationship in fact which justifies the reposing of confidence in one party by another. See Remediation Servs., Inc., 209 Ga. App. at 431, 433 S.E.2d at 635. Notably, the existence of a confidential relationship depends upon the circumstances and therefore is generally a jury issue. See Middleton v. Troy Young Realty. Inc., 257 Ga. App. 771, 773, 572 S.E.2d 334, 337 (2002) (citing Williams v. Dresser Indus., 120 F.3d 1163, 1168 (11th Cir. 1997); see also Glades Pharms., LLC v. Murphy, 2005 WL 3455857, at *5 (N.D. Ga. Dec. 16, 2005).

In GIW's view, there is little question that Quackenbush's relationship was one which required confidence. In fact, GIW contends that Quackenbush was its agent while employed as Plant Engineer, and, according to the plain terms of O.C.G.A. § 23-2-58, a principle-agent relationship establishes a confidential relationship as a matter of law. See Williams, 120 F.3d at 1168 (11th Cir. 1997) ("In cases where Georgia courts have found the existence of a confidential relationship in business, the parties have had . . . the kind of relationship that is not arms-length, such as a partnership or principal and agent.").

Under Georgia law, "[a]n agency relationship arises wherever one person, expressly or by implication, authorizes

15

another to act for him." <u>McLane</u>, 269 Ga. at 606, 503 S.E.2d at 281 (quoting O.C.G.A. § 10-6-1). Thus, an agency relationship exists when there has been a delegation of discretionary power to act, to manage an affair, and to render an account. <u>See</u> <u>Headrick v. Fordham</u>, 154 Ga. App. 415, 416-17, 268 S.E.2d 753, 754-55 (1980)(citations and punctuation omitted). Put simply, an agent "has authority to establish contractual relations with third parties and his principal." <u>Lane Co. v. Taylor</u>, 174 Ga. App. 356, 362, 330 S.E.2d 112, 118 (1985).

The undisputed evidence shows that, in his employment for GIW, Quackenbush was intimately involved in the negotiations leading up to and the continuous administration of the contracts with JerPeg.[8] Not only was Quackenbush responsible for bringing JerPeg to GIW, he was the employee charged with supervision and inspection of JerPeg's contract work. (Harris Dep. at 86.) While Quackenbush lacked the authority to issue oral modifications to existing contracts, he was given significant responsibility. Specifically, he was authorized to prepare bid documentation and enter into contracts to carry out his work. He was also authorized to oversee contractors, inspect their work, and verify that the work was completed correctly. (Harris Dep. at 10-11; Harris Decl. ¶¶ 4-5, 10; Harris Dep., Ex. 1.)

In sum, Quackenbush's job description and duties would allow a reasonable jury to find that GIW's and Quackenbush's relationship justified GIW reposing confidence in Quackenbush.[9]

---

[8]It bears mentioning that the JerPeg defendants do not dispute that Quackenbush was an agent for GIW. (<u>See,</u> <u>e.g.,</u> JerPeg Defs.' St. of Undisputed Mtl. Fact, ¶ 6.)

[9]Having identified an issue of material fact as to whether Quackenbush and GIW shared a confidential relationship requiring a fiduciary duty, it is unnecessary to address GIW's argument that Quackenbush nevertheless owed it a duty of loyalty, faithful service, and

(See Harris Dep., Ex. 1.) Accordingly, this issue, together with the issue of Quackenbush's alleged breach of any existing fiduciary duty, will proceed to trial.[10]

## B. **Fraud Claim**

Under Georgia statutory law, "[a]ctual fraud consists of any kind of artifice by which another is deceived." O.C.G.A. § 23-2-51. Federal and state courts have long recognized that fraud is "difficult to define" and that there is "no absolute rule as to what facts constitute[] fraud . . . ." See Massey-Ferguson, Inc. v. Bent Equipment Co., 283 F.3d 12, 15 (5th Cir. 1960) (citation omitted); see also Grainger v. Jackson, 122 Ga. App. 123, 176 S.E.2d 279 (1970) (holding that in an action for fraud, although there are "traditional elements which must be proved . . . [e]qually basic however, is the proposition that fraud is in itself subtle")(citations omitted).

As explained by the Eleventh Circuit, "[b]ecause fraud in itself is by nature subtle and often difficult to prove, the Georgia courts have held that slight circumstances may be sufficient to prove its existence." Wilson v. S & L Acquisition Co., 940 F.2d 1429, 1440 (11th Cir. 1991). In fact, courts have held that fraud "can be accomplished in an infinite number of ways including signs and tricks and even, in some instances, by silence." Infinity Ins. Co. v. Martin, 240 Ga. App. 609, 611, 524 S.E.2d 294, 296 (1999)(citation and punctuation omitted).

---

regard for its interest. See Wilson v. Wilson, 277 Ga. 801, 805, 596 S.E.2d 392, 395 (2004) (citation omitted) (holding that although an employee generally does not owe fiduciary duties to his or her employer [absent a confidential relationship], Georgia law has continually implied a duty of loyalty, faithful service and regard for an employer's interest).

[10]As discussed infra in Section III. B., there exists a question of fact as to whether Quackenbush breached his fiduciary duty owed to GIW.

As stated in <u>Quill v. Newberry</u>, 238 Ga. App. 184, 189, 518 S.E.2d 189, 193 (1999), proof of fraud is rarely "susceptible of direct proof." Consequently, recourse to circumstantial evidence usually is required. <u>Id.</u> Perhaps most importantly, it is peculiarly the province of the jury to pass on the circumstances showing fraud. <u>See id.</u>

Notwithstanding the foregoing, Georgia law requires that a plaintiff prove the following essential elements to establish the tort of fraud:

> (1) Misrepresentation by a defendant of a material existing fact; (2) with knowledge that it is false or with reckless disregard as to whether it was true; (3) with intent to induce the plaintiff to act or refrain from acting; (4) that is justifiably relied upon by the plaintiff; and (5) that because of such reliance, the plaintiff is damaged.

<u>See</u> <u>Grizzle v. Guarantee Ins. Co.</u>, 602 F. Supp. 465, 467 (N.D. Ga. 1984); <u>Management Assistance, Inc. v. Computer Dimensions</u>, 546 F. Supp. 666, 671 (N.D. Ga. 1982), <u>aff'd</u>, 747 F.2d 708 (11th Cir. 1984).

In a comprehensive surreply filed with the Court, GIW summarized the basis underlying its fraud allegations:

- Quackenbush started working at GIW in April 2003 and he brought JerPeg to GIW in July 2003; unexplained cash deposits appeared in Quackenbush's bank account from approximately September 2003 through 2005. (<u>See generally</u> Douglas Decl.)

- JerPeg demobilized and left GIW around Thanksgiving 2005. At the time, it had several open projects. Quackenbush tendered his resignation less than one month later.

- Following Quackenbush's departure, Charles Harris and his colleagues learned that hard copies of material pertaining to JerPeg's projects were missing. (Harris Dep. at 55-56, 107, 112-13.) Those documents were never located. According to GIW, this was particular to JerPeg only.

- The Soultzes at least occasionally emailed JerPeg's invoices to Quackenbush's personal email account, which circumvented GIW's practices and protocol in the handling of invoices. (Parr Dep. at 20.)

- Quackenbush, while employed with GIW, would tell the Soultzes where JerPeg needed to set its bid in order to obtain GIW's work, thus circumventing the bid process. (Quackenbush Dep. at 289-90.)

- During the period of his employment with GIW, Quackenbush received what GIW contends is "secret consideration" from JerPeg in the form of labor on the residence Quackenbush leased, which accrued to his benefit, and for which JerPeg paid.[11] (Quackenbush Dep. at 260-61, 269; Soultz Dep. at 84.)

- Mr. Soultz admitted in deposition that some invoices JerPeg transmitted to GIW were untrue or misrepresented the work JerPeg performed. For example, Jerry Soultz testified that it was a lie that JerPeg provided $67,750 in drawing work or PE stamps, as indicated on invoice 05-JP-124 for Purchase Order G-54592. (Soultz Dep. at 134.)

- Although there was no provision in any contract for payment in advance of work performed or materials provided, Mr. Soultz admitted in deposition that, through Quackenbush, he and JerPeg were paid in advance of JerPeg's work on some projects. (Soultz Dep. at 148-49.)

- An analysis of Quackenbush's financial records reveals that Quackenbush, from approximately September 2003 through 2005, deposited sums of cash into his bank account which exceeded his salary and undeclared income about which he testified in deposition. (See Douglas Decl.)

## 1. **Fraud Claims Against Jerpeg and Quackenbush**

The crux of GIW's fraud allegations center around Jerpeg's

---

[11]Noteworthy is this context is the fact that upon his hire at GIW, Quackenbush and his wife rented a house in an upscale subdivision in Augusta, Georgia. (Quackenbush Dep. at 63, 260-62.) Quackenbush testified that his landlord allowed him to perform work on the residence, for which he was credited when paying his monthly lease. (Id. at 260-62, 269.) According to Quackenbush, JerPeg workers performed work at his leased residence, which he estimated to be 30 to 40 hours of labor. (Id. at 269.) Quackenbush's payment to the JerPeg laborers for this 30-40 hours of work consisted of a meal "and a couple of beers, no money." (Id. at 260.)

submission of invoices that falsely represented the work the company provided under the PO contracts at issue. For example, with regards to the Toshiba project, Mr. Soultz acknowledged in his deposition that the wording of the invoice was a false statement. It is also undisputed that, as sole principals of Jerpeg, either Jerry or Peg Soultz drafted the invoices. In short, there is sufficient evidence of false statements made by Jerpeg and its principals.

Directing its summary judgment argument to the intent element, JerPeg contends "there is no proof of any intent to deceive GIW" because "GIW's agent [Quackenbush] told JerPeg when to submit invoices, and instructed them to put the same description on the invoices as was on the purchase orders." (JerPeg Mem. at 28.) GIW argues that the record is not as clear as JerPeg makes it out to be. While Quackenbush's deposition does suggest that he encouraged contractors to submit invoices that followed the PO, Quackenbush also testified that "I never told [JerPeg] how to actually word an invoice. It was normally just copied off the purchase order."

Here, Mr. Soultz acknowledged that false statements were made on invoices. Of course JerPeg intended GIW to rely on the invoices so that they would receive payment. Regardless, scienter is "peculiarly" a jury issue; it deals with the choice of what to believe regarding a subjective state of mind seldom capable of direct proof. Clearly, making a choice as to what to believe has no place in summary judgment, particularly where "intent is virtually always a question for the jury." Pinkerton & Laws Co. v. Roadway Express, Inc., 650 F. Supp. 1138, 1148 (N.D. Ga. 1986). In sum, if the facts are construed in the light most favorable to GIW, there exists an issue of material fact as to whether Jerpeg intended to deceive GIW with its

invoices.

Regarding the justifiable reliance element, Defendants assert that the work JerPeg contracted to perform was "in plain sight" and GIW's failure to exercise "due diligence" prior to paying the invoices now precludes GIW's recovery in tort. In essence, the Defendants reason that such failure precludes GIW from alleging justifiable reliance. Although a party must exercise reasonable diligence to protect itself against the fraud of another, a party is not bound to exhaust all means at its command to ascertain the truth before relying upon the representations, and the question whether the complaining party could have ascertained the falsity of the representations by proper diligence is for determination by the jury. Gaines v. Watts, 224 Ga. 321, 322, 161 S.E.2d 830, 832 (1968); see also Dyer v. Honea, 252 Ga. App. 735, 740, 557 S.E.2d 20, 26 (2001). If, however, the means of ascertaining the relevant facts are equally available to all parties, summary judgment may be appropriate. See Dyer, 252 Ga. App. at 740, 557 S.E.2d at 26.

While ordinarily a plaintiff must exercise due diligence in discovering the alleged fraud, in this case, GIW has alleged a fiduciary or confidential relationship existed between Quackenbush and GIW. Under Georgia law, the required degree of care to detect fraud is much less when there is a confidential relationship between the parties. See U.S. for Use & Benefit of Meva Corp. v. Northeast Construction Co. of W.Va., 298 F. Supp. 1135 (S.D. Ga. 1969); Walsh v. Campbell, 130 Ga. App. 194, 198, 202 S.E.2d 657, 661 (1973) ("When a confidential relationship exists between the parties, a greater degree of reliance and a lesser degree of diligence on one's behalf are required of a plaintiff."); see also Lawyers Title Ins. Corp. v. New Freedom

21

Mtg. Corp., 285 Ga. App. 22, 32-33, 645 S.E.2d 536, 544 (2007).

In this context, JerPeg vehemently argues that while Quackenbush may have been in a confidential relationship with GIW, JerPeg itself was not. In opposition, GIW contends that Quackenbush and JerPeg acted jointly in carrying out a scheme to defraud. Federal courts have held that if a plaintiff is capable of proving such a scheme, the acts of each defendant could be imputed to the other, and, thus, an intentional misrepresentation by one defendant potentially could bind the other in an action based upon fraud. See Hubbard v. Stewart, 651 F. Supp. 294, 299 (M.D. Ga. 1987).

This is significant because GIW has presented evidence of a social and business relationship between JerPeg's owners and Quackenbush. GIW has produced circumstantial evidence that Quackenbush and JerPeg jointly perpetrated a fraud on GIW, eliciting payments from GIW based on misrepresentations about work which was not completed or was performed in an unworkmanlike manner. Specifically, it is undisputed that Quackenbush was charged with soliciting bids, and the evidence shows that he, at least occasionally, would give Mr. Soultz an indication as to where JerPeg needed to set its bid. (Quackenbush Dep. at 289-90.)

In addition, Quackenbush was tasked with the responsibility of verifying JerPeg's work and determining that JerPeg competently completed the projects which it agreed to perform. (Harris Decl. ¶ 5; Harris Dep. at 86.) Contrary to his assigned role, the evidence shows that Quackenbush approved JerPeg's invoices, notwithstanding that JerPeg failed to complete the work which it had contracted to complete. (Quackenbush Dep. at 112-13, 121-25, 138-40, 143, 148, 156,

22

161-62, 178, 180-81, 211-12, 216, 223-26, 229-30, 232, 237.) In some instances, Quackenbush actually submitted invoices and solicited payment on JerPeg's behalf prior to JerPeg performing any work on the contract(s) in question. (Harris Dep. at 36.) Moreover, Quackenbush received free services (such as labor on the house he was renting) and, according to GIW's allegations, cash from JerPeg and/or the Soultzes for directing work to JerPeg on GIW's behalf. (Quackenbush Dep. at 260-61, 269; see also Douglas Decl. ¶ 21.)

This relationship between JerPeg and Quackenbush is also significant because the burden on a fraud claimant to protect itself by investigating the facts before proceeding with a transaction tends to diminish in proportion to the egregiousness of the alleged fraud. Thus, while the claimant is "bound to make inquiry and examination for [it]self so as to ascertain the truth" in cases where the alleged fraud "consists of general commendations or mere expressions of opinion, hope, expectation and the like," Miller v. Clabby, 178 Ga. App. 821, 822, 344 S.E.2d 751, 752 (1986), it has been held that this burden does not "place the law in the untenable position of throwing a mantle of protection about people who have engaged in a cheating and swindling operation." Smith v. Holman, 117 Ga. App. 248, 249, 160 S.E.2d 533, 534 (1968).

In this context, to the extent GIW personnel noticed deficiencies in JerPeg's work, Quackenbush assured GIW that the contracted work would be performed. For example, when Quackenbush told Harris that the projects would be completed, Harris justifiably relied on Quackenbush's representations. After all, it was Quackenbush's job to make sure that JerPeg properly completed its projects. Had Harris been aware of the

evidence, now known, indicating that Quackenbush was self-dealing with JerPeg or that JerPeg was making cash payments to Quackenbush, he may have acted differently.

Moreover, the perpetrator of a fraud should not be permitted to set up as a defense that the victim should not have relied upon its good faith and honesty. <u>See</u> <u>id.</u> Ultimately, JerPeg's contention that GIW should be penalized for relying on the representations of its agent would place a premium on a successfully orchestrated fraudulent scheme. In short, GIW has demonstrated a genuine issue of fact as to whether Quackenbush and JerPeg acted jointly in defrauding GIW.

Assuming *arguendo* that Quackenbush and GIW did not have a confidential relationship, there nevertheless exist issues of material fact as to whether GIW was justified in its reliance on JerPeg's invoices. According to GIW, at least some of the projects on which JerPeg worked were not open and obvious. While it is true that some of the projects at issue involved large pieces of equipment, other projects involved steel or duct work, which GIW personnel had no way of inspecting. (<u>See,</u> <u>e.g.</u>, Harris Decl. ¶ 26.) If the facts are construed in a light most favorable to GIW, Harris' testimony that all of Jerpeg's work was not open and obvious is sufficient to create an issue of disputed fact on JerPeg's underlying premise. (<u>See</u> <u>id.</u>)

Furthermore, Quackenbush testified that even he was often unaware of what work JerPeg did or did not perform because he relied on the representations of JerPeg's crew and laborers to inform him of what was completed. (Quackenbush Dep. at 112-13, 225-26, 229-30.) JerPeg also argues that GIW could not have reasonably relied on the "short descriptions" JerPeg made in invoices it submitted. In opposition, GIW contends that while

24

the invoices were typically short, they were also descriptive. Moreover, there is no dispute that JerPeg failed to comply with at least some of them. Under these circumstances there is a jury issue on whether GIW was justified in relying on JerPeg's representations in paying the invoices.

Ultimately, the invoice practices constitute evidence from which a jury might conclude that JerPeg engaged in covert dealings with Quackenbush. Also, as argued by GIW, Quackenbush's alleged destruction of business records might "be considered by a jury to be evidence of fraud." See Lane v. Montgomery Elevator Co., 225 Ga. App. 523, 525, 484 S.E.2d 249, 251 (1997). Given the subtle nature of fraud and the well-established principle that slight circumstances of artifice or trickery can be sufficient to allow a jury to consider a fraud claim, this is not a "plain and indisputable" case that can be resolved on motion for summary judgment. Quill, 238 Ga. App. at 189, 518 S.E.2d at 193. The Defendants may have strong jury arguments to make on this issue, but Plaintiff has sufficiently shown this Court that there is a genuine issue of material fact as to whether JerPeg and Quackenbush's conduct was fraudulent.

## 2. **Fraud Claims Against Jerry and Peg Soultz**

Mr. and Ms. Soultz argue that they are not liable individually with respect to the fraud claims advanced by GIW. Although shareholders or officers in a corporation enjoy limited liability, they may be liable individually for their own tortious or wrongful acts. Moore v. Barge, 210 Ga. App. 552, 554, 436 S.E.2d 746, 749 (1993) (citation omitted).

A corporate officer who takes part in the commission
of a tort by a corporation is personally liable

> therefore, but an officer of a corporation who takes no part in the commission of a tort committed by the corporation is not personally liable unless he specifically directed the particular act to be done or participated or co-operated therein (or if he disregarded the corporate form so as to authorize piercing of the corporate veil).

Chemtall, Inc. v. Citi-Chem, Inc., 992 F. Supp. 1390, 1402 (S.D. Ga. 1998) (quoting Weir v. McGill, 203 Ga. App. 431, 432, 417 S.E.2d 57, 59 (1992)).

To the extent the Soultzes argue that they are protected by a "corporate veil," this protection cannot be afforded to "a party [who] has over extended his privilege in the use of a corporate entity in order to defeat justice, perpetrate fraud or evade contractual or tort responsibility." Cheney v. Moore, 193 Ga. App. 312, 313, 387 S.E.2d 575, 576 (1989) (citations and punctuation omitted).

Here, there is evidence that Jerry Soultz personally participated in the commission of a tort. Mr. Soultz has admitted that JerPeg invoiced GIW for "preparatory work on drawings and PE stamp for Toshiba machine foundation as per our proposal;" charged $67,750 for that work; received payment; and did not give a PE stamp to GIW. (Soultz Dep. at 130.) Mr. Soultz has testified that he and Ms. Soultz handle all the invoicing for JerPeg, and that was the case at all times material to GIW's allegations. (Id. at 33.) In fact, Mr. Soultz has admitted that JerPeg invoiced GIW for work which was not done. (See generally Defs.' Exs. 23-35.) In short, there is sufficient evidence to submit to a jury whether Mr. Soultz personally took part in the commission of a tort. Accordingly, the Court cannot conclude as a matter of law that Mr. Soultz is shielded from liability.

With regard to Ms. Soultz, the parties dispute her involvement in JerPeg's dealings with GIW. GIW points to Ms. Soultzes' deposition testimony where it was established that she has been doing some of the invoicing for JerPeg since 1985. (Peg Soultz Dep. at 7.) As a result, GIW argues that Ms. Soultz is actively involved in JerPeg's business. However, Ms. Soultz also testified that she does not have any technical expertise and was not made aware of what was going on in the plants. In fact, her primary involvement in the project was handling certain paperwork at JerPeg's Indiana office. (Id. at 36.) While there is evidence in the record that Mr. Soultz was aware of the status of the work invoiced and was, at various times, present on the GIW job site, there is no evidence that Ms. Soultz was ever on the job site or knew any of the work was misrepresented on the invoices. As such, there is no evidence that Ms. Soultz personally took part in the commission of a tort. Further, there is no evidence that Ms. Soultz specifically directed the particular act to be done or otherwise participated therein. See Chemtall, 992 F. Supp. at 1402.

Nevertheless, if the Soultzes disregarded the corporate form, the Court may pierce the corporate veil and hold Ms. Soultz personally liable. See id. In this context, GIW introduces evidence of payments made from JerPeg to Mr. and Ms. Soultz and other payments from Mr. and Ms. Soultz to Jerpeg. GIW asserts that such payments constitute "excessivecommingling" between JerPeg's assets and assets of the Soultzes.

Notably, "[t]he corporate veil may be pierced where the parties themselves have disregarded the separateness of legal

entities by commingling on an interchangeable or joint basis or confusing the otherwise separate properties, records or control." Earnest v. Merck, 183 Ga. App. 271, 273, 358 S.E.2d 661, 663 (1987). In the case at bar, however, there is no abuse of corporate form to justify piercing the corporate veil. The Court has not been presented with nor found any evidence in this record to indicate that the Soultzes, in addition to acting as the principal officers of Jerpeg, also conducted their private and corporate business on an interchangeable or joint basis as if they were one.

While GIW broadly alleges an "excessive commingling" theory, there is no specific allegation that the Soultzes shared funds with JerPeg on an interchangeable basis such that there was confusion as to the otherwise separate properties, records, or controls. More specifically, GIW has not alleged that JerPeg was underfunded, that corporate formalities were not followed, or that it had any confusion that it was dealing with a corporate entity in JerPeg. Rather, the record indicates that all invoices were submitted under the corporate logo and all payments received in corporate accounts. In short, GIW's allegations are insufficient, standing alone, to pierce the corporate veil under an "excessive commingling" theory. As a result, Ms. Soultz cannot be held personally liable on the fraud claim.

## C. **Breach of Contract**

### 1. **Whether GIW is Bound by Quackenbush's Actions**

GIW alleges that JerPeg breached nineteen (19) PO contracts by failing to perform, either partially or entirely, under the terms of the contracts. Jerpeg argues that Quackenbush directed it to perform certain work in exchange for other work and accepted JerPeg's work by approving the invoice. In Jerpeg's view, then, it is entitled to judgment as a matter of law because Quackenbush, as GIW's agent, bound his principal when he modified the scope of work and approved JerPeg's invoices. As a result, the threshold issue before the Court is whether GIW is bound by Quackenbush's actions.

As an initial matter, GIW does not dispute that Quackenbush was its agent. However, GIW steadfastly maintains that, under Georgia law, a principal is not bound by an agent's actions if the agent has placed himself in a position conflicting with its principal, such as when the agent is self-dealing or is serving two or more masters. See Arthur v. Georgia Cotton Co., 22 Ga. App. 431, 96 S.E. 232, 232 (1918); accord Pursley v. Stahley, 122 Ga. 362, 50 S.E. 139, 140 (1905); see also Remediation Servs., 433 S.E. 2d at 634-36. Stated differently, if an "agent places himself in a position antagonistic to that of his principal, by receiving from the buyer a secret consideration for any act within the scope of his agency, the contract thus negotiated by the agent in his own interest is not binding upon the principal." Arthur, 96 S.E. at 232-33.

In support of its assertion, GIW points out that the record contains evidence of self-dealing. For one, GIW has tendered proof that Quackenbush received what GIW characterizes as "secret consideration" from JerPeg in as much as its laborers performed work on Quackenbush's leased residence. Moreover, there is some evidence of unexplained cash deposits made to Quackenbush's personal bank account which coincide precisely with the time frame JerPeg was under contract with GIW. Similarly, there is evidence in the record that Quackenbush approved JerPeg's invoices which he knew to be false. Simply put, when Quackenbush purportedly "swapped work" with JerPeg or accepted JerPeg's incomplete or shoddily completed projects, his actions were beneficial to himself while simultaneously detrimental to GIW. Ultimately, these facts create an issue of material fact as to whether Quackenbush was self-dealing.

In sum, given the circumstances indicating that Quackenbush may have been self-dealing and the fact that the record contains sufficient evidence such that a material issue of fact exists as to whether the work under the contracts was actually performed according to contract, summary judgment is not appropriate on GIW's breach of contract claims.[12]

## 2. **Whether GIW Ratified the Acts of Quackenbush**

Lastly, Jerpeg has moved for summary judgment on the basis that GIW ratified Quackenbush's actions. More specifically, JerPeg maintains that because most of the purchase orders at

---

[12]Having determined there are questions of fact as to whether Quackenbush was self-dealing, the Court need not address JerPeg's argument that "oral modifications are enforceable, even if the purchase order had stated that modifications should be written," (see Jerpeg's Mot. for Summ. J. at 15), or any arguments that GIW otherwise waived the requirement of a written change order.

issue in this litigation stated that the work was performed per Quackenbush's instructions, GIW either had knowledge or was put on notice of the status of work at the time it paid invoices. See Bielicki v. Terminix Intl. Co., L.P., 225 F.3d 1159, 1164 (10th Cir. 2000) ("Ratification requires either knowledge of the material facts or circumstances sufficient to put a reasonable person on notice to inquire into these facts, not both.").

However, "before ratification will be found, it must be determined that the principal possessed full knowledge of all material facts relevant to the act ratified." Gift Collection, Ltd. v. Small Business Admin., 738 F. Supp. 487, 493 (N.D. Ga. 1989). Furthermore, "a principal is not put on notice of the unauthorized act of an agent by the mere knowledge of the agent of the acts he himself has done in excess of his authority." Newton v. Gulf Life Ins. Co., 55 Ga. App. 330, 190 S.E. 69, 71 (1937) (citing Penn Mut. Life Ins. Co. v. Blount, 165 Ga. 193, 140 S.E. 496, 496 (1927)).

In the case at bar, GIW did not have knowledge that the nineteen purchase orders were incomplete, not completed at all, or suffered from poor workmanship when Quackenbush approved the invoices for payment. Quackenbush's signature on the invoices indicated to GIW that the work had been done according to standards. Although JerPeg argues that GIW was put on notice, it is undisputed that GIW personnel inquired of Quackenbush and that he assured satisfactory completion. (See Harris Dep. at 16; Neal Dep. at 35, 41-42.) Put simply, because issues of material fact exist as to whether Quackenbush was self-dealing, JerPeg is precluded from binding GIW with Quackenbush's actions. In short, GIW did not have full knowledge of

Quackenbush's actions. Accordingly, the Court cannot conclude that GIW's payment constituted ratification.

Similarly, JerPeg's argument based upon the theory that "[t]he institution of a suit by a principal in his own name is a ratification of an agent's unauthorized act," will not control. Lankford v. Orkin Exterminating Co., Inc., 266 Ga. App. 228, 230, 597 S.E.2d 470, 473 (2004) (citation omitted). Ordinarily, where one is induced to enter into a contract by fraud, the defrauded party has an election either to affirm the contract and sue for damage or rescind the contract. See Price v. Mitchell, 154 Ga. App. 523, 524, 268 S.E.2d 743, 745 (1980). However, this principle does not necessarily apply where the alleged fraud does not relate purely to the inducement to enter into the contract. See Long v. Marion, 182 Ga. App. 361, 366, 355 S.E.2d 711, 716 (1987) (reasoning that because the fraud did not relate purely to the inducement to enter into the contract, damages for both breach of contract and fraud would not necessarily be duplicative).

In the case at bar, the record contains allegations and evidence regarding fraud in obtaining payment from GIW. Importantly, this involved matters other than those connected with obtaining GIW's agreement to enter into the contract. In fact, GIW has acknowledged that the nineteen purchase orders were authorized agreements. As stated above, however, there is evidence from which a jury could conclude that Quackenbush acted outside the scope of his authority after he entered into these authorized agreements by soliciting payment for JerPeg for monies it had not earned. Given these facts, the Court cannot conclude that GIW's attempt to recover damages for breach of contract amounts to ratification.

## V. CONCLUSION

Upon the foregoing, Defendants' motions for summary judgment (doc. nos. 41, 57) are **GRANTED IN PART** and **DENIED IN PART**. More particularly, Defendant Jerpeg's motion for summary judgment on Plaintiff's fraud claim against Margaret Soultz is **GRANTED**. Defendants' motions for summary judgment on all other claims are **DENIED**. The following claims shall proceed to trial: the fraud claim against Defendants JerPeg, Quackenbush, and Jerry Soultz; the breach of fiduciary duty claim against Defendant Quackenbush; and the breach of contract claims against Defendant Jerpeg. The Court does not and should not express an opinion about the weight of the evidence presented entitling the Plaintiff to withstand summary judgment on the enumerated claims.

**ORDER ENTERED** at Augusta, Georgia, this 10th day of January, 2008.

_____
HONORABLE LISA GODBEY WOOD
UNITED STATES DISTRICT JUDGE